UNITED STATES *v.* GREEK ORTHODOX CHURCH OF EVANGELISMOS
(No. 5075)*

*C.A.D. 792.

United States Court of Customs and Patent Appeals, February 13, 1962

*William H. Orrick, Jr.*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Alan S. Rosenthal, Robert E. Powell*, and *John C. Eldridge*, trial attorneys, of counsel) for the United States.

*Nicholas Tsoucalas* for appellee.

[Oral argument November 17, 1961, by Mr. Eldridge and Mr. Tsoucalas]

Before RICH, Acting Chief Judge, and MARTIN and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

KIRKPATRICK, Judge, delivered the opinion of the court:

This appeal by the United States is from the judgment of the Customs Court, First Division, C.D. 2241, sustaining a protest filed by the appellee against the collector's assessment of duty at 16⅔% ad valorem upon an imported iconostasis (also referred to in the testimony as an iconastas). The import is a screen or partition which is erected in the sanctuary of a Greek Orthodox Church upon the same platform upon which the altar table stands.

The collector's assessment was made under paragraph 412 of the Tariff Act of 1930 which covers manufactures "wholly or in chief

---

[1] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell*, pursuant to provisions of Section 294(d), Title 28, United States Code.

value of wood, not specially provided for." The judgment of the Customs Court was that the imported iconostasis is a shrine or part of a shrine, in either case entitled to free entry under paragraph 1774 of the Tariff Act of 1930, the pertinent language of which is as follows:

* * * shrines, or parts of any of the foregoing, * * * imported in good faith * * * for the use of * * * any corporation or association organized and operated exclusively for religious purposes.

It is not questioned that the import, if a shrine or a part thereof, qualifies for free entry under paragraph 1774.

The facts are undisputed and the evidence consists of the testimony of a single witness, a priest of the Greek Orthodox Church, of over 14 years experience in various ecclesiastical positions and thoroughly familiar with the liturgy of the church, together with photographs and the stipulated testimony of the Archbishop of the Greek Archdiocese of North and South America in accordance with a letter from him which was produced to the court.

The iconostasis is an elaborately adorned structure made of wood, extending clear across the church, but not reaching to the ceiling, and separating the greater part of the altar sanctuary from the rest of the church. It is correctly described in the opinion of the court below as follows: "The iconostasis has three doors, one in the center and one at each side. These are used during services by priests and lesser orders assisting them in approaching and receding from the altar according to the liturgy of the church. At other times, the doors are closed. The center door is a double door, while the side doors are single. On the upper panel of each door, and in each of four similar panels of the iconostasis here involved, as it was ultimately erected in the church, is an icon, a holy picture, which, it appears, was not on the iconostasis when it arrived in this country."

Each panel has a slightly recessed portion surrounded by a decorative frame or border in which an icon is installed. The icons are, in accordance with the liturgy of the Greek Orthodox Church, placed before the congregation as visible aids for worship, and it is one of the functions of the iconostasis to hold and display them. They are regarded as sacred and are honored with a relative [2] worship. They represent the persons of Jesus, the Virgin Mary and various saints. Their respective positions upon the iconostasis, as fixed by the canons of the church, are described by the witness, Father Kazanas, as follows: "As we face the altar, to the right of the main altar gate, or the Iconostas gate, is the icon of our Lord, and next to our Lord, always the icon of St. John the Baptist, or the last of the Prophets before

---

[2] Webster's New International Dictionary (1932) "relative * * * 6.a offered or paid indirectly, as by means of an image;—said of worship."

Jesus. On the left, as we face it, the icon of the Mother of God, and next to * * * the icon of the Mother of God, the icon of the Patron Saint of the church in question * * *. The doors are always iconographed or portrayed with the two archangels, Michael and Gabriel, as messengers of God."

During services in the church, the priest goes back and forth through the main doors of the iconostasis, the lesser orders assisting through the side doors. When the priest is officiating at the altar table, the doors, or at least the lower parts of them, are closed at times. During the service the priest bows before the icons. Often, when there is no service taking place, members of the congregation will pray before an icon. On various holidays as the feast of a saint is celebrated, his panel will have candles before it as well as "offerings," the nature of which was not specified. Unquestionably the icons are objects of religious veneration, and the sole question on this appeal is whether the structure which holds them, the iconostasis, is a shrine or part of a shrine within the intent of Congress.

There are no decisions of this court dealing with any article or structure similar to the import involved in the present case.

In *United States* v. *Rambush Decorating Co.*, 48 CCPA 123, C.A.D. 776, we said, "Although it has been urged that when ecclesiastical words are involved, canonical law should be controlling, nothing has been brought to our attention which convinces us that we should ascertain the congressional meaning of such words differently than when confronted with purely secular words." We adhere to this principle, and any reference to the liturgy of the church in this opinion is merely for the purpose of showing the function (not the nature) of the iconostasis as installed in the church.

 In determining the significance of a term in the tariff law, courts look to the commonly accepted meaning, definitions from dictionaries and also to the legislative history of the enactment. In the present case the word "shrine" has such a wide range of meanings and is commonly applied to such a variety of objects, structures and places [3] that it is hardly possible to say with any assurance what the commonly accepted meaning is. Nor are the dictionary definitions of very much help. We find them inconclusive. Typical is the definition given by the Oxford English Dictionary (1914) which is as follows: "1. A box, coffer; a cabinet, chest * * *. 2. The box, casket, or other repository in which the relics of a saint are preserved. Also, a tomb-like erection of rich workmanship, enclosing the relics of a saint * * *. A receptacle containing an object of religious veneration; occas. a niche for sacred images * * *. 3. A case or casket for a dead body; also a tomb or

---

[3] Thus, the word may properly be applied to a church or temple, a reliquary, a house a room, a grotto, a mountain top, a piece of statuary, or a picture.

cenotaph of an elaborate kind * * *. 4. trans. That which encloses, enshrines, or screens, or in which something dwells * * *. 5. A place where worship is offered or devotions are paid to a saint or deity; a temple, church * * * fig. in contexts referring to the veneration or idolizing of some person or thing * * *."

However, "Evidence as to common meaning is advisory only in determining the question * * *." "When lexicons have proved to be inconclusive, the courts have looked to testimony in the record * * * and to legislative history." *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 CCPA 88, 90, C.A.D. 735.

Turning to the legislative history, the term in question appeared in the Tariff Act of 1922, paragraph 1674, and, at a time when that act was in force, in *C. Wildermann Co.* v. *United States*, 56 Treas. Dec. 572, T.D. 43713, the Customs Court said: "It appears that although a shrine was originally a tomb containing the bones of saints or other sacred person, the meaning of the word has, through the ages, been recognized by the lexicographers to have enlarged in scope so as to embrace a receptacle containing an object of religious veneration, such as a *niche for sacred images*." [Emphasis supplied.] This decision was presumably known to Congress when it reenacted, as paragraph 1774 of the Act of 1930, the same language which had been construed by the Customs Court. The authorities are not entirely uniform upon the point, but this court has held that, although the reenactment of the statute after a judicial interpretation by a court which is not a court of last resort "may not be a controlling consideration, it is a matter we think proper to consider along with" other matters. *Oxford University Press, N.Y., Inc.* v. *United States*, 33 CCPA 11, 22, C.A.D. 309.

Since the passage of the 1930 act, the Customs Court in a consistent series of decisions has construed the words "shrine or parts of shrines" broadly enough to cover the present case. Thus in *The Gasparri Studios* v. *United States*, 33 Cust. Ct. 470, Abstract 58614, the court held that a marble frame or mounting intended as part of an elaborately ornamented setting for a picture of the Madonna and Child together with a bronze grille to protect the work was a shrine and refused to adopt the defendant's contention that the painting alone was the shrine. It has also been held that statuary and bas-reliefs depicting successive incidents in the passion of Christ, constituting the "Stations of the Cross" were shrines; also icon prayer-stands to each of which, after importation, an icon was affixed. Even if there were no evidence afforded by the legislative history, we would hesitate to overrule a line of cases that has extended over 30 years though not the decisions of a court of last resort.[4]

---

[4] The decisions relied on by the court below are *Rev. Domenico M. Coda* v. *United States*, 57 Treas. Dec. 20, T.D. 43774; *Reverend G. Ginard* v. *United States*, 64 Treas. Dec. 382, T.D. 46684; *Nicholas J. Stevason* v. *United States*, 32 Cust. Ct. 469, Abstract 58041; and *The Gasparri Studios* v. *United States*, 33 Cust. Ct. 470, Abstract 58614.

From the evidence before us we find no difficulty in concluding that each icon with its immediate setting is a shrine within the meaning of the Tariff Act of 1930, and we are unable to see why the structure which holds these sacred pictures should be excluded from the meaning of the word "shrine" (or part of shrine) merely because it houses eight shrines instead of one.

Nor do we think that the fact that the iconostasis has a dual function disqualifies it for free entry under paragraph 1774. The evidence is that the whole structure, including the icons and their settings, is a part of the canonical requirements of the Greek church and such a church cannot, except by special dispensation, be consecrated unless it has an iconostasis installed. Whether the function of dividing the altar sanctuary so that the altar can be closed off from the congregation or the function of providing a place for the display of the holy images is, from the standpoint of the worshippers, the more important functions is a matter hardly susceptible of a definite finding. The conclusion might be drawn that the latter is the more important from the fact that the derivation of the noun, "iconostas," which denominates the import is, from the Greek, "a place for icons, holy pictures, to stand." In any event, a nice balance need not be attempted. It is clear that the function of the iconostasis as a screen does not so far preponderate that the function of providing a setting for the icons can be said to be incidental or negligible.

This court pointed out in *United States* v. *St. Joseph's Church*, 48 CCPA 42, C.A.D. 761, and *United States* v. *Buck's Inc.*, 47 CCPA 12, C.A.D. 721, that ▮ Congress clearly intended to confine the articles of church furniture accorded free entry to those specifically mentioned in the free list, but those opinions are not inconsistent with the rule of liberal construction in favor of the importer stated by the Supreme Court in *Benziger* v. *United States*, 192 U.S. 38. What they decided was that the free list of articles of church furniture was not to be expanded, under the guise of a "liberal" construction, beyond the plain meaning of the terms used. We think it is a case in which the appellee is entitled to the full benefit of a liberal construction and that doubts (and we do not pretend that the case is free from doubt) should be resolved in its favor.

Worley, C. J., did not sit or participate in decision.